UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————————

HECTOR GONZALEZ,

                          Petitioner,

        -vs-                              **No. 6:13-CV-6574(MAT)**
                                          **DECISION AND ORDER**
MARK BRADT,

                          Respondent,

———————————————————————

## I.   Introduction

Petitioner pro se Hector Gonzalez ("Petitioner") seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on the basis that he is being held in Respondent's custody in violation of his federal constitutional rights. Petitioner is incarcerated as the result of a judgment entered on April 29, 2010, in Erie County Court (Amico, J.) of New York State, following a non-jury trial convicting him of one count of second degree murder (N.Y. Penal Law § 125.25(1)) and one count of second degree criminal possession of a weapon (id., § 265.03(3)).

## II.  Factual Background and Procedural History

### A.   Summary of the Trial Testimony

Wanda Santana ("Santana") had two children with the decedent, Edwin Lasalle ("Lasalle"). During the spring of 2009, she began a four-month-long intimate relationship with Petitioner, whom she knew only as "Indio". Lasalle was aware of the former relationship between Sanatana and Petitioner; it was a source of contention among the three individuals.

On July 31, 2009, Lasalle drove Santana and her two-year-old son to Children's Hospital in the City of Buffalo to visit her stepbrother, Victor. After Victor was discharged a few hours later, Santana and several of her friends and family-members took a cab back to her neighborhood.

Santana stopped into the corner store to buy some chips and soda for her son, and then began walking towards Petitioner's home at 109 Auburn Avenue. She explained that the purpose of her visit was to attempt to resolve the tensions between Petitioner and Lasalle. Before Santana reached Petitioner's address, Lasalle approached her in his vehicle and began to argue with her, demanding that she get into the car. Lasalle turned his car around and drove the wrong way down Auburn, a one-way street, so that he could follow Santana. The two continued to argue.

As Santana passed 109 Auburn, she overheard Petitioner say in Spanish, "[G]ive me a gun!" Lasalle got out of his car, grabbed Santana's cell phone, punched her in the face, and threw her to the ground. Yaritza Acevedo-Rivera ("Rivera"), who had been at the hospital with Santana, witnessed the confrontation with Lasalle. Rivera, armed with a bat, began to argue with Lasalle. While Santana was on the sidewalk and Lasalle standing was next to his car, Petitioner, accompanied by several individuals, arrived and began arguing with Lasalle. Petitioner shot Lasalle in the head

with a handgun from a range of about four to five feet. He and his companions then fled towards 109 Auburn.

Additional eyewitnesses observed the shooting. Briana Tirado ("Tirado") was living at 122 Auburn on the date of the incident. At around 4:00 p.m., she heard an argument outside followed by a loud noise that at first sounded like fireworks. Tirado then saw Petitioner, whom she knew lived at 109 Auburn, running towards his house and putting something in his waistband.

Lolitha Wright ("Wright"), who lived at 130 Auburn, heard an argument outside her house at about 4:00 p.m. on July 31, 2009. She saw a man and a woman, whom she did not recognize, arguing. As she turned to say something to her grandson, she heard a gun shot. Wright then saw Petitioner run towards West Street holding a shiny object in his hand.

Barbara Winslow ("Winslow") resided at 71 Dewitt Street. On July 31, 2009, at around 4:00 p.m., she heard a commotion outside her house. Looking outside, Winslow saw an argument between a man and a woman standing near a car parked facing in the wrong direction on Auburn Street. A second woman was nearby holding a baseball bat. Winslow saw two men approach the group, one of whom wrestled with the man who was arguing. As the man in the argument tried to get up, Winslow heard a gun shot. The man who had been arguing fell to the ground. Winslow, who could not identify the

shooter, recognized the two men as being from the neighborhood; she had seen them before at 109 and 116 Auburn.

Rivera, the woman whom several witnesses saw holding a baseball bat, testified for Petitioner, her uncle. On July 31, 2009, she was staying with him at 109 Auburn. As she was walking back to 109 Auburn with Santana, they were approached by Lasalle in his car. Lasalle tried to hit them with his car and proceeded to beat Santana by striking her repeatedly and then kicking her while she was on the ground. Lasalle threatened to kill Santana and Petitioner. According to Rivera, upon seeing Lasalle attack Santana, Petitioner locked himself inside of 109 Auburn, did not come out to help Santana, and instructed Rivera to mind her own business. Rivera recalled that while Santana was on the ground, four to five individuals whom she did not know appeared on the scene, shot Lasalle, and then fled. Had Lasalle attacked her, she would have gone after him with a bat, which, according to her, she did not have at the time of the incident.

Samuel Mercedes ("Mercedes") was called as a defense witness and testified that on July 31, 2009, he lived at 33 Dewitt. Mercedes saw a man drive the wrong way down Auburn and get into a confrontation with two women, one of whom had a bat. He recalled hearing a gun shot but could not see the shooting or any of the participants in the altercation that preceded it. At the time, Mercedes believed the shooter was a woman.

As the result of complications from the gun shot wound to his right temple, Lasalle died on August 6, 2009. Santana gave a statement to the police implicating Petitioner as the shooter.

During their investigation, the police were unable to locate any shell casings, which suggested that the shooter had used a revolver. When police attempted to apprehend Petitioner at his Auburn Street residence, they could not find him. Buffalo Police Department Detective Brendon Kiefer obtained information from Petitioner's uncle that he was in Puerto Rico. Petitioner was arrested in Humanco, Puerto Rico on August 22, 2009, and returned to the United States.

Following his arrest, Petitioner phoned Santana numerous times and repeatedly urged her to contact his attorney, telling her that "him coming out [of jail] was in '[her] hands.'" T.128-31.[1] Petitioner ordered Santana not to date anyone else while he was away.

Abner Garcia ("Garcia"), who had a history of multiple felony convictions, was arrested for his involvement in a home invasion on October 4, 2009, and placed in the Erie County Holding Center. While there, Garcia ran into Petitioner, whom he had known for 15 years. When Garcia asked Petitioner why he had photos of Lasalle's girlfriend, Petitioner replied that "she was his". T.349.

---

[1] Numerals preceded by "T." refer to pages from the transcript of Petitioner's trial.

Petitioner confided to Garcia that he was in jail for murdering Lasalle. According to Garcia, Petitioner told him that Lasalle had pulled up to Santana on a one-way street and had gotten into an argument with her. Petitioner approached and shot Lasalle in the back of the head with a .38 caliber revolver and then ran towards West Street. Petitioner said that Santana was going to contact his attorney and change her statement to exonerate him. Petitioner explained that he had fled to Humanco, Puerto Rico, but one of his cousins had "ratted him out" to the police. T.351. Some time later, Garcia saw Petitioner in the holding area at the courthouse, and Petitioner stated, "[T]hese crackers ain't got shit on me, I'm going to beat this body." T.353.

Judge Amico returned a verdict finding Petitioner guilty as charged in the indictment. He sentenced Petitioner to an aggregate term of 22 years to life in prison.

The Appellate Division, Fourth Department, of New York State Supreme Court unanimously affirmed Petitioner's conviction on direct appeal. People v. Gonzalez, 89 A.D.3d 1443 (4th Dep't 2011), lv. denied, 19 N.Y.3d 973 (2012), reconsideration denied, 20 N.Y.3d 932 (2012).

This timely habeas petition followed, in which Petitioner asserts the following grounds for relief: (1) the identification procedure was unduly suggestive; (2) Garcia was a government agent and should not have been permitted to testify as to Petitioner's

jailhouse statements made to him; (3) the evidence is legally insufficient making Petitioner's conviction violative of the Due Process Clause; and (4) the prosecution committed a violated their obligations under Brady v. Maryland, 373 U.S. 83 (1963).

For the reasons that follow, Petitioner's request for writ of habeas corpus is denied, and the petition is dismissed.

## III. Merits of the Petition

### A.    Suggestive Identification

On the first day of trial, a Wade[2] hearing was conducted regarding a photo array identification of Petitioner. W.15.[3] Detective Mario Pratts ("Pratts") testified that his first contact with the identifying witness, Tirado, was on February 23, 2010, less than one month before the trial was scheduled to begin. W.13. After taking Tirado's statement regarding the incident, he showed her an array which contained photos of six Hispanic men of "varying complexions" ranging from "[m]edium to dark". W.13, 15-16. Tirado told Pratts, when she selected the photograph of Petitioner, that the shooter was the "dark one from 109 Auburn". W.20-21.

---

[2]

United States v. Wade, 388 U.S. 218 (1967).

[3]

Numerals preceded by "W." refer to pages from the transcript of the Wade hearing held on March 22, 2010.

Petitioner argued on appeal that "a cursory review of the photo array[4] demonstrates that the photograph directly above [Petitioner]'s depicts a man with the fairest complexion of all six photographs", and therefore Petitioner's photograph "stood out 'as markedly different from' the photograph directly above it which considerably increased the likelihood of a misidentification." Petitioner's Appellate Brief ("Pet'r App. Br.") at 5 (quoting People v. Gee, 99 N.Y.2d 158, 163 (2002)). According to Petitioner, based on Tirado's "inclination to select the photograph of a man with a dark complexion", the photo array with a lighter-complected individual directly above Petitioner's photo made it "'so impermissibly suggestive as to give rise to the substantial likelihood of irreparable misidentification[.]'" Id. (quoting Simmons v. United States, 390 U.S. 377, 384 (1968)).

On direct appeal, the Appellate Division held that the County Court properly refused to suppress Tirado's identification testimony on the ground that the photo array presented to her was unduly suggestive, because "the subjects depicted in the photo array [were] sufficiently similar in appearance so that the viewer's attention [was] not drawn to any one photograph in such a way as to indicate that the police were urging a particular

---

[4]

The Court notes that the photo array has not been provided by Petitioner or Respondent as part of the record.

selection[.]" People v. Gonzalez, 89 A.D.3d at 144 (quotations omitted; alteration in original). This factual determination by the state court is presumed to be correct, and may only be rebutted by "clear and convincing evidence," 28 U.S.C. § 2254(e)(1). See, e.g., Jamison v. Girdich, No. 03 Civ.4826 HB, 2005 WL 2338660, at *5 (S.D.N.Y. Sept. 26, 2005) (state court's conclusions that petitioner's scar was "barely visible" and that the fillers in the photo array and lineup were sufficiently similar in appearance to petitioner were factual determinations presumed to be correct under 28 U.S.C. § 2254(e)(1)). Here, Petitioner has failed to rebut this presumption of correctness with any evidence, much less the "clear and convincing" evidence demanded by 28 U.S.C. Section 2254(e)(1), and habeas relief therefore is not warranted on his claim that the photo array was unduly suggestive. See, e.g., Jamison, 2005 WL 2338660, at *5.

**B.   Failure to Exclude Testimony by Jailhouse Informant**

**1.   Background**

Plaintiff alleged that Garcia was an agent of the government and, therefore, his testimony should be barred as having been solicited in violation of Petitioner's Sixth Amendment right to counsel. Prior to Garcia being permitted to take the stand, a hearing pursuant to People v. Cardona, 41 N.Y.2d 333 (1977), was held to determine if he had been acting as an agent of the state when Petitioner made certain inculpatory statements to him.

Garcia was arrested on October 4, 2009, on charges of robbery in the first degree, burglary in the first degree, criminal use of a firearm in the first degree, and criminal possession of a weapon in the second degree. Almost immediately, Garcia sought out Buffalo police detectives regarding a 1998 homicide about which he had knowledge. Garcia testified that he asked to speak with police about the 1998 homicide because he wanted to obtain some kind of beneficial treatment in connection with his current arrest.

Garcia met with Detective Patrick Judge and Sergeant Jonathan Walton on the morning of October 5, 2009, in an interview room in the Buffalo Police Department about the 1998 homicide, which was not related to Petitioner's case in any way. During that conversation, Garcia never mentioned Petitioner. The police officers did not instruct Garcia to obtain information regarding other homicides generally, or Petitioner's case specifically, but simply said that if he had information about any other homicides, to contact them.

After his conversation with the police officers, Garcia was placed in the cell above Petitioner's at the holding center. Garcia first encountered Petitioner at the holding center about a week after his initial booking, at which time Petitioner talked about his case. T.317. Garcia also ran into Petitioner some time later in the court holding area, where Petitioner again made remarks

concerning his case. Garcia testified that he had known Petitioner for over a decade; their siblings had dated each other previously.

On December 8, 2009, prior to his sentencing, Garcia met with law enforcement and informed them about Petitioner's statements. T.318.

The trial court determined that "there really [was]n't any evidence" of "an enduring relationship between this witness [Garcia] and the People[.]" T.340. Furthermore, there "[was]n't any evidence that [Garcia] was instructed or coached by the police or prosecutors to gain any information from [him]." T.340-41. Rather, Garcia "freely volunteer[ed] the information" and "contacted the District Attorney's Office on his own initiative through contact with his own attorney." T.341. Accordingly, the trial court concluded that Garcia was not an agent of the prosecution and could testify. Id.

The Appellate Division held that the trial court "properly determined that a witness who testified concerning inculpatory statements made to him by defendant while they were both incarcerated was not acting as an agent of the police when defendant made the statement[.]" Gonzalez, 89 A.D.3d at 1444 (citations omitted).

### 2.  Analysis

In New York State criminal practice, the term "Cardona hearing" is typically used to refer to a hearing held pursuant to

<u>Massiah v. United States</u>, 377 U.S. 201 (1964). In <u>Massiah</u>, the Supreme Court held that once a defendant's Sixth Amendment right to counsel attaches, the government may not "deliberately elicit[ ]" inculpatory information from the defendant "in the absence of counsel," and explicitly applied this prohibition to the use of undercover agents or government informants for the purposes of obtaining such statements. 377 U.S. at 206-07. The <u>Massiah</u> rule "covers only those statements obtained as a result of an intentional effort on the part of the government, so information gotten before the inmates become agents/informants is not protected by the rule." <u>United States v. Stevens</u>, 83 F.3d 60, 64 (2d Cir. 1996). <u>Massiah</u> does not apply to exclude statements made completely voluntarily by an accused. <u>Id.</u> (citation omitted).

In <u>Cardona</u>, the New York Court of Appeals reviewed a defendant's claim that the trial court had erroneously held, after a suppression hearing, that a fellow inmate's statements were not made in violation of the <u>Massiah</u> rule. <u>Cardona</u>, 41 N.Y.2d at 334. Due to the procedural posture in <u>Cardona</u>, and the New York Court of Appeals' ability to decide only questions of law, the lower court's admission of the informants' testimony was required to be upheld unless it could be said, as a matter of law, "that the sole inference to be drawn from the facts . . . is that the inmate-witness was acting as an agent for the prosecution." <u>Id.</u> at 334-35. Given that the lower courts had determined that the factual

predicates for a finding of agency were absent, the Court of Appeals could not say that, based on the unreviewable factual findings, the lower court's ultimate conclusion was erroneous as a matter of law. Id. at 335.

Here, the trial court made the following findings after the Cardona hearing: there was no evidence that any promise was made to Garcia by the police in exchange for any information he supplied; he did freely volunteered the information to the police; Garcia contacted the district attorney's office regarding Petitioner's case on his own initiative; Garcia was not instructed or coached by the police or prosecutors to seek out any information from Petitioner. T.340-41. These factual findings are entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1), and can only be overturned upon a showing of clear and convincing evidence by Petitioner. Petitioner's assertion that the witnesses were not credible is plainly insufficient to overcome § 2254(e)(1)'s presumption. In light of the trial court's unreviewable factual findings, this Court cannot say that Petitioner's statements were "obtained as a result of an intentional effort on the part of the government[,]" Stevens, 83 F.3d at 64. Therefore, Garcia's testimony did not run afoul of the Massiah rule.

## C.   Insufficiency of the Evidence

On direct appeal, Petitioner argued at length that the conviction was against the weight of the credible evidence. His

argument regarding the legal insufficiency of the evidence did not identify any particular elements on which the prosecution's proof allegedly was lacking; instead, he merely requested that the Appellate Division "review this issue as a matter of discretion and in the interests of justice[.]" Pet'r App. Br. at 18. The Appellate Division concluded that the evidence against Petitioner, viewed in the light most favorable to the prosecution, was legally sufficient to support the conviction, and also not against the weight of the evidence. Gonzalez, 89 A.D.3d at 1444 (citations omitted).

"[T]he Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" Jackson v. Virginia, 443 U.S. 307, 315 (1979) (quotation omitted). The only "relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 318-19 (citations omitted; emphasis in original).

Petitioner's arguments concerning the sufficiency of the evidence founder because they are based solely upon attacking the credibility of the witnesses and the weight that should be accorded their testimony. Questions of witness credibility belong to the fact-finder, and the arguments Petitioner makes were already

presented to, and resolved by the judge at his non-jury trial, and then examined again by the Appellate Division pursuant to its factual review powers. Accord, e.g., Garrett v. Perlman, 438 F. Supp.2d 467, 470 (S.D.N.Y. 2006) ("Petitioner's specific argument in support of this claim, that King's testimony was 'incredible,' is likewise not reviewable in habeas proceedings since credibility determinations are the province of the jury.") (citing Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996) ("[A]ssessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on [habeas] appeal.")).

Notably, the only specific arguments made on appeal regarding the strength of the prosecution's case were asserted in support of his argument concerning the weight of the credible evidence. Neither on direct appeal nor on federal habeas is a court reviewing a sufficiency of the evidence claim permitted to revisit the factfinder's determinations as to the witnesses' credibility and veracity. E.g., United States v. Strauss, 999 F.2d 692, 696 (2d Cir. 1993) ("[T]he jury is exclusively responsible for determining a witness' credibility.") (citation omitted); Gruttola v. Hammock, 639 F.2d 922, 928 (2d Cir. 1981) (rejecting insufficient evidence claim raised by habeas petitioner because jury was entitled to believe prosecution's witnesses despite inconsistencies in their testimony and prosecution's evidence)). The proof presented at Petitioner's trial, recited above in this

Decision and Order, more than adequately satisfies the due process standard set forth in <u>Jackson v. Virginia</u>. Habeas relief is not warranted on his legal-insufficiency claim.

    D.   **<u>Brady</u> Violation**

        1.   **Background**

On September 10, 2009, defense counsel served a discovery demand pursuant to New York Criminal Procedure Law ("C.P.L.") § 240.20-l(h), for disclosure of anything required to be disclosed prior to trial by the prosecutor pursuant to the New York State and United States Constitutions. In an affidavit sworn to on October 22, 2009, the prosecutor responded that she was not aware of any evidence that tended to exculpate Petitioner.

On Mach 22, 2010, after three witnesses had testified for the prosecution on the first day of trial, defense counsel advised the trial court that the prosecutor had turned over that day, as part of discovery material, a witness's statement which identified that shooter as a female. Defense counsel was referring to the statement of Samuel Mercedes, who said that while standing on the porch at 17 Dewitt on July 31, 2009, he saw an argument and heard "a loud bang". <u>See</u> Court Exhibit ("Ex.") 1, at 1-2}. He did not see the shooting because his view was obstructed. <u>Id.</u>, at 2. He saw a blonde-haired woman swinging a long object which was not a gun. He reached the conclusion that the shooter must have been a woman, not a man.

-16-

Defense counsel argued that Mercedes' statement constituted Brady material that had been requested more than six months prior to trial, and advised the court that if the information had been provided previously, he would have interviewed him. Defense counsel claimed that Mercedes' version of events undermined the prosecutor's theory, because his statement identified another person as the shooter. The prosecutor disputed that the statement constituted Brady material because the witness conceded he did not see the actual shooting. T.188-90. She also noted that she had been unable to find Mercedes but provided defense counsel with his address and phone number, which had been redacted from the statement. At that point, the trial judge indicated that he would look at the statement and advised that the prosecution would "proceed at their own peril, if there is something that is clearly Brady material." T.189.

The next morning, the judge stated that his initial review of the statement led him "to believe that maybe the police were putting words in this witness's mouth." He said "[i]t would have been nice to err on the side of caution [and] give [defense counsel] this earlier on." The judge noted that defense counsel could "probably investigate it", and he would be given whatever time he needed. The judge concluded,

> Now the other side of that thing is this may or may not be Brady depending on how things go here. That's a close call on that statement but there might be some

-17-

information in there [defense counsel] use for
impeachment depending on what witnesses testify here.

Defense stated that he intended to locate Mercedes, interview him, and call him as a defense witness. If he were unable to locate Mercedes at the close of the prosecution's proof, he would request a continuance. T.198. The prosecutor reiterated that Mercedes' statement was not exculpatory or impeaching because, inasmuch as his conclusion about the gender of the shooter was not based on his direct, personal knowledge, it did not serve to impeach Santana's testimony by specifically contradicting it.

Defense was able to locate Mercedes after a continuance was granted at the close of the prosecution's proof. He called Mercedes as a witness for the defense, but complained because he was not able to utilize the information to cross-examine the prosecution's witnesses.

On direct appeal, the Appellate Division rejected Petitioner's claim that the prosecution failed to disclose Brady material in a timely manner. The Appellate Division stated that even assuming arguendo Mercedes' statement was exculpatory, "reversal was not required" because Petitioner received the statement as part of the discovery material provided to him, and was given a "meaningful opportunity to use the exculpatory evidence[.]" Gonzalez, 89 A.D.3d at 1444 (quotation omitted).

2.  **Analysis**

The Supreme Court has explained that there are "three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281–82 (1999). As the Second Circuit has noted, the Supreme Court has not "specif[ied] the extent or timing of disclosure Brady and its progeny require, except in terms of the sufficiency, under the circumstances, of the defense's opportunity to use the evidence when disclosure is made." Leka v. Portuondo, 257 F.3d 89, 100 (2d Cir. 2001) (citations omitted). Disclosure prior to trial thus is not mandated; instead, the prosecution must disclose Brady material in time for its effective use at trial. See Leka, 257 F.3d at 100; United States v. Coppa, 267 F.3d 132, 144 (2d Cir. 2001) ("[T]here is no Brady violation unless there is a reasonable probability that earlier disclosure of the evidence would have produced a different result at trial.").

Here, the Appellate Division's finding that defense counsel had a "meaningful opportunity" to use the material in question "mirrors the standard articulated by the federal courts regarding whether or not there has been a 'suppression' of favorable evidence." Torres v. Donnelly, 454 F. Supp.2d 75, 79 (W.D.N.Y.

2006) (citing Leka, 257 F.3d at 100). The Appellate Division's ultimate holding, therefore, was a correct application of clearly established federal law. Id. This Court notes that even though the trial court initially told defense counsel that he could have whatever time was needed in order to investigate Mercedes' statement, counsel chose not to ask for a continuance until after all of the prosecution's witnesses had testified. Thus, he should not be heard to complain that he did not the opportunity to cross-examine the prosecution's witnesses with Mercedes' statement. In any event, Petitioner cannot show that he was prejudiced by the prosecution's belated disclosure. Contrary to Petitioner's contention, Mercedes' testimony did not amount to convincing proof that a woman committed the murder, since, by Mercedes' own admission, he did not actually see the shooting.

## IV.  Petitioner's Motion for Appointment of Counsel

As discussed above in this Decision and Order, none of Petitioner's claims warrant habeas relief. Because Petitioner's habeas claims uniformly are without merit, the appointment of counsel is moot. The Court notes that there are no complex factual or legal issues in Petitioner's case requiring the assistance of counsel; the claims were resolvable based on the record. Appointment of counsel in this matter therefore would be an abuse of the Court's discretion.

## V.   Conclusion

For the reasons discussed above, the petition for a writ of habeas corpus is dismissed. Petitioner's motion for appointment of counsel (Dkt #5) is denied with prejudice. The Court declines to issue a certificate of appealability because Petitioner has not made a substantial showing of the denial of a constitutional right. See 28 U.S.C. § 2253(c)(2).

**IT IS SO ORDERED.**

S/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:      April 7, 2014
            Rochester, New York